UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

RENERE HIGHTOWER,

                    Defendant.

**MEMORANDUM AND ORDER**

19-CR-459 (LDH)

LaSHANN DeARCY HALL, United States District Judge:

Defendant Renere Hightower was arrested on September 11, 2019, and charged with one count of being a felon in possession of a firearm and ammunition. (ECF Nos. 1, 4–5.) Defendant moves to suppress both the firearm and ammunition that were recovered from his person. (ECF. Nos. 13, 15.)

## BACKGROUND

On September 11, 2019, at approximately 11:05 p.m., an individual (the "Caller") called 911 (the "Initial Call") and reported that a man, had physically assaulted a woman and pulled out a weapon in the vicinity of the intersection of Malcolm X Boulevard and Dekalb Avenue in Brooklyn, N.Y. The Caller described the man as a black male wearing a white t-shirt, a hat, and blue jeans. The 911 operator requested the Caller's name, to which the Caller replied "Gordon." The operator read back the phone number that appeared on her screen, which the Caller confirmed as his. At approximately 11:08 p.m., the operator dispatched a request for two units to respond to a "family assault in progress" with a "possible weapon involved." The operator described the male, now known to be Defendant, as a black male wearing a blue hat and a white T-shirt. The operator also indicated that Defendant was walking with a black female. Four officers responded to the dispatch: Lt. Kountouris and Officer Flanagan in one car; and Officers

1

Husband and Parish in another. Lt. Kountouris and Officer Flanagan arrived at the original location approximately 11:13 p.m. The officers, however, did not see any individual who matched the description provided by the operator. As a result, Lt. Kountouris requested that the operator contact the Caller. The operator complied and contacted the Caller (the "Second Call") at the phone number confirmed during the Initial Call. During the Second Call, the Caller indicated that he was following Defendant and provided the operator with Defendant's updated location. The operator informed the Caller that the officers were coming to interview him, advised him not to follow Defendant, and dispatched the officers to the updated location. Lt. Kountouris and Officer Flanagan then proceeded to the updated location. As the officers were attempting to locate Defendant, the Caller, who was on the phone with the operator and watching nearby, informed the operator that the officers had just passed Defendant in their cars.

In addition to the calls between the Caller and the operator, there were several calls between the Caller and the responding officers. Between 11:15 p.m. and 11:29 p.m., the time of Defendant's arrest, Lt. Kountouris and Officer Flanagan called and spoke to the Caller three times.[1]

At approximately 11:24 p.m., the officers observed Defendant at the intersection of Malcolm X Boulevard and Halsey Street. The officers exited their vehicles, and Lt. Kountouris and Officer Flanagan approached Defendant. Lt. Kountouris grabbed Defendant by the arm and escorted him to the front of the police car. He then asked Defendant if he had anything on him.

---

[1] According to the Government, during one call, the Caller provided updated location information to the officers, and clarified that the individual who had brandished the weapon was wearing a white T-shirt, blue jeans, and a hat. The Government also maintains that, during the final call, the Caller confirmed that the assailant had a gun, which he described as a "little thing," and that the individual that the responding policemen were watching at that moment was the assailant. Defendant maintains that none of the calls between the officers and the Caller produced any additional information, particularly concerning the alleged weapon. The Court need not resolve this factual dispute as a resolution is not necessary to the Court's findings.

Defendant did not respond. The officers then proceeded to search Defendant. At some point during the search, Lt. Kountouris felt a metal object in Defendant's front, right pocket. Lt. Kountouris placed his hand in Defendant's pocket and removed a knife. He then resumed the pat-down search. At some point after resuming the search, Lt. Kountouris felt a metal object near Defendant's crotch area, which prompted him to instruct the officers to handcuff Defendant and conduct a more thorough search of Defendant's person.

During this search, the officers opened Defendant's pants, and retrieved a firearm from Defendant's underwear. The officers then placed Defendant under arrest. During a subsequent search of Defendant at the precinct, the officers recovered a loaded magazine from Defendant's left shoe. The magazine fit the previously recovered firearm.

## DISCUSSION

"Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) (internal citation omitted). "Police must be able to point to specific and articulable facts which taken together with rational inferences from those facts warrant [the] intrusion [on a citizen's liberty interest.]" *Id.* at 178–79 (quoting *Terry v. Ohio*, 392 U.S. at 21). Notably, "reasonable suspicion must arise before a search or seizure is actually effected." *United States v. Simmons*, 560 F.3d. 98, 107 (2009). To determine whether reasonable suspicion is present, courts in the Second Circuit "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Freeman*, 735 F.3d 92, 96 (2d. Cir. 2013); *see also United States v. Roberts*, No. 18-CR-96, 2018 WL 4521206 at * 1 (E.D.N.Y. Sept. 21, 2018) ("The standard

3

for reasonable suspicion is "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in their belief."). Where reasonable suspicion is based on information received from an informant, the tip must bear sufficient indicia of reliability to provide reasonable suspicion for the search. *Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . , however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"); *Elmore*, 482 F.3d at 179 ("Reasonable suspicion may be based upon [a tip] . . . so long as the tip bears sufficient 'indicia of reliability.'")

## I. The Initial Stop Was Supported by Articulable Suspicion

Defendant argues that the officers did not have the requisite reasonable suspicion to stop him because their knowledge was based on an anonymous tip. Under law, where an officer's suspicion is predicated upon an informant's tip, "courts must assess whether [the] informant's tip establishes reasonable suspicion under the totality of the circumstances approach." *See Elmore*, 482 F.3d at 179.

> Where the informant is known from [the past] to be reliable . . . no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous . . . a significant amount of corroboration will be required. However, when the informant is partially known, a lesser degree of corroboration may be sufficient.

*Id*. at 181. Thus, whether a tipster is anonymous is not, in and of itself, dispositive of whether reasonable suspicion exists. The inquiry must rightfully focus on corroboration.

Defendant maintains, on the facts of this case, that the Court can conclude that reasonable suspicion did not exist. To this point, Defendant highlights that the Caller did not provide his

4

full name to the operator, the operator had no reason to believe that the Caller's pre-paid phone was traceable to him, the Caller's telephone number was not transmitted over NYPD radio, and the officers failed to corroborate the information provided by the Caller because they did not obtain any additional information during their communications with the Caller.

In making his argument, Defendant relies principally on the Supreme Court's decision in *Florida v. J.L.* *J.L.* is distinguishable. In *J.L.*, the officers received an anonymous tip that an individual wearing a plaid shirt was armed and currently located at a bus stop. *J.L.*, 529 U.S. at 268. Based on this tip, the officers traveled to the identified location and stopped the defendant. *Id*. In addressing a challenge to the legality of the stop, the Court found that the tip was unreliable because it had come from an unknown, unaccountable source who failed to indicate any basis for his or her knowledge of concealed criminal activity, and thus the officers lacked reasonable suspicion to stop the defendant. *Id*. In other words, the Court held that, an anonymous tip, without more, is insufficient to establish reasonable suspicion for an investigatory stop. *Id*.

In contrast to *J.L.*, the Caller in this case provided the operator with his name, confirmed his contact information, and was able to be contacted at the provided phone number by both the operator and the officers. Also, unlike the caller in *J.L.*, here the Caller indicated the basis of his knowledge of Defendant's alleged criminal activity. Specifically, during the Initial Call, the Caller indicated that he personally observed Defendant beat a woman and brandish a firearm. Moreover, upon arrival at the scene, the officers, with the Caller looking on, confirmed that the

person who the officers were watching was the individual who the Caller had observed brandish a firearm. For these reasons, the tip was sufficiently reliable to provide a basis for the stop.[2]

The Government also rightly directs the Court to the Supreme Court's decision in *Navarette v. California*. In *Navarette*, the Supreme Court held that information provided by an anonymous 911 caller who identified a truck that had allegedly run her car off the road was sufficiently reliable to provide reasonable suspicion for officers to stop a truck matching the description the caller had provided. *Navarette v. California*, 572 U.S. 393, 395 (2014). The Supreme Court found that although the call was anonymous, it bore adequate indicia of reliability because the caller claimed eyewitness knowledge of the truck's alleged dangerous driving, and, the timeline of events from the call up until the stop suggested that the caller reported the incident soon after it had occurred. *Id*. at 399. The facts here are similar to those present in *Navarette*.

Like the caller in *Navarette*, the Caller here indicated that he had eyewitness knowledge of Defendant's criminal activity because he observed Defendant beat a woman and brandish a weapon. Additionally, the timeline of events here too suggests that the Caller made a contemporaneous report of the incident as Defendant was apprehended less than 20 minutes after the Initial Call, not far from the first location that the Caller provided to the operator. Moreover, the Caller followed Defendant and provided updated locations to the operator and the responding

---

[2] Defendant's arguments under *Freeman* are equally unavailing. In *Freeman*, the Second Circuit, applying *J.L.*, vacated the district court's denial of the defendant's motion to suppress on the grounds that the two anonymous tips in that case lacked sufficient indicia of reliability. *Freeman*, 735 F.3d at 98. There, the court reasoned that although the caller's number was known and the call was recorded, there was no indication that the number was retraceable, and thus no way for the police, or the court itself to determine the caller's credibility or honesty. *Id*. The court was particularly concerned with the fact that the caller was never tracked down, even up until the time of the suppression hearing. *Id*. Such concerns are not present in this case. Indeed, unlike in *Freeman*, in this case, both the operator and the officers contacted and spoke to the Caller several times at the number he confirmed during the Initial Call. What is more, unlike the caller in *Freeman*, the Caller here was contacted after Defendant's arrest and provided a formal, in-person statement at the precinct.

officers up until moments before Defendant's arrest. Thus, the tip in the present case "bore adequate indicia of reliability for the officer[s] to credit the [C]aller's account" and rely on the information provided to establish reasonable suspicion.[3] *Id*. at 399.

## II. The Immediate Search Was Supported by Reasonable Suspicion

Defendant contends that even if the officers had reasonable suspicion to make the initial stop, they lacked reasonable suspicion to support the subsequent search. In opposition, the Government argues that the officers were justified in conducting the pat-down search of Defendant to neutralize any potential threat based on their reasonable belief that Defendant was armed. The Court agrees.

Under *Terry*, an officer may conduct a pat-down search of a suspect during a valid stop where the officer maintains a reasonable belief that his safety or that of others is in danger. *See United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) ("[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a de facto arrest."). "The officer need not be

---

[3] The officers' reliance on the tip here was also proper under the Second Circuit's "current-emergency rule," which provides that a lesser standard of reasonable suspicion is warranted where an anonymous tipster alleges a current emergency. *Simmons*, 560 F.3d at 108. In *Simmons*, officers stopped and frisked the defendant based on a dispatch from an anonymous-911 call during which the caller described an individual engaged in an on-going assault possibly involving a gun. *Id*. at 101. At some point prior to the officers' arrival at the scene, the assault concluded. *Id*. Notwithstanding this fact, the court held that the officers' reliance on the tip was reasonable because the officers confirmed that the defendant met the description of the suspect and was present at the location the caller had provided. *Id*. at 108. The court concluded that "[t]he officers' corroboration of information identifying the suspect . . . is entitled to more weighty consideration in the context of an emergency 911 call." *Id*. This is not unlike the case here. Defendant contends that this case is distinguishable from *Simmons* because all of the facts present in *Simmons* are not present here. Even if true, the presence of all of the specific facts in that case is not necessary for a finding of reliability. Indeed, the *Simmons* court specifically stated that other facts could provide the indicia of reliability necessary to establish reasonable suspicion. *Id.* ("It is a relevant consideration, though by no means dispositive, that the officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area."); *see also Navarette*, 572 U.S. at 404 (stating that "there is more than one way to demonstrate a particularized and objective basis for suspecting the particular person stopped of criminal activity.")

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. Because this Court has found that the officers' reliance on the Caller's statements established reasonable suspicion for the stop, and those statements indicated that Defendant was armed, it follows under the facts of this case that the subsequent pat-down search was legally permissible.

### III. The Officers Did Not Exceed the Bounds of Terry When They Searched Beyond Defendant's Outer Clothing.

Defendant maintains that even if the search was supported by reasonable suspicion, the search was nonetheless unlawful because the officers exceeded the limitations of an investigatory search as contemplated by *Terry*.

*First*, Defendant makes the curious argument that the officers made no attempt to follow the *Terry* protocol, and, instead, "went directly to the frisk stage" without making an inquiry to confirm or dispel any possibility that Defendant was engaged in criminal activity, and armed and dangerous. Nonsense. As previously discussed, the officers involved in this case followed the Terry protocol. The Court directs Defendant to page 16 of his brief where he rightly asserts that "the 'two conditions' for a constitutional *Terry* 'stop and frisk' [include]: (1) [that] the officer has reasonable suspicion 'that the person apprehended is committing or has committed a criminal offense'; and (2) [that] 'to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.'" Again, this was done here and nothing more was required.[4]

---

[4] Moreover, Defendant's contention that the officers failed to conduct an initial inquiry, assuming a verbal inquiry was required, is belied by the record. Indeed, prior to commencing the search, Lt. Kountouris asked Defendant if Defendant had anything on him, to which Defendant did not respond.

*Second*, Defendant contends that *Terry* only permits officers to "conduct a carefully limited search of [a suspect's] outer clothing," and thus the search of Defendant's underwear was impermissible. Defendant reads *Terry* too narrowly.

Under *Terry*, officers are permitted to conduct a more extensive search beyond a suspect's clothing where, during a pat-down search, the officer feels what he reasonably believes is a weapon on the suspect's person. *See id.* at 29–30 (finding that the scope of the search conducted was proper where the officer patted down the outer clothing of petitioner and his two companions, and searched inside of the defendants' pockets and under the outer surface of their garments once he had felt weapons); *c.f. United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002) (finding that the officer's act of placing his hand into the defendant's pocket prior to determining that the defendant had a weapon was unreasonable and exceeded the bounds of Terry). In other words, a search must only be "reasonably related in scope to the circumstances which justified the interference in the first place." *Casado*, 303 F.3d at 447 (quoting *Terry*, 392 U.S. at 20).

Here, the officers initially conducted a routine pat-down search of Defendant. Only after feeling what they believed to be weapons did the officers conduct more thorough searches which resulted in the recovery of a knife from Defendant's pocket, and a gun from Defendant's crotch area. The officers' search beyond Defendant's outer clothing therefore did not exceed the scope permitted under *Terry*.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the firearm and ammunition obtained from his person on September 11, 2019, is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
      April 10, 2020

/s/ LDH
L<small>A</small>SHANN D<small>E</small>ARCY HALL
United States District Judge